**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

RYAN VIGIL,

     Plaintiff,

v.                                        Civ. No. 17-656 SCY/KK

ANTHONY DELFIN, EDDIE TUDOR,
*individually and in their official capacities*,
and ENERGY, MINERALS, AND NATURAL
RESOURCE DEPARTMENT, *a cabinet
department of the* STATE OF NEW MEXICO,

     Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION TO SUPPLEMENT COMPLAINT**

Plaintiff is a firefighter who claims that, without offering him any due process,

Defendants Anthony Delfin, Eddie Tudor, and the Energy Mineral and Natural Resource

Department ("EMNRD") made a decision to fire him in 2014 and, in later years, illegally refused

to re-hire him. *See* Doc. 1-2 (Complaint). Plaintiff also seeks to supplement his complaint to

include allegations that, this past year, the new head of the EMNRD, Donald Griego, has

unconstitutionally interfered with his ability to maintain employment elsewhere. Doc. 42.

Defendants have moved for summary judgment, arguing that Plaintiff has not established a

violation of his liberty or property rights and, therefore, cannot prevail on his claims under the

Fourteenth Amendment of the United States Constitution. Doc. 18. Defendants further argue that

Plaintiff cannot obtain injunctive relief under the New Mexico Constitution because he has no

property right and cannot prevail on his claim for breach of implied written contract because no

written contract existed. *Id*. The individual Defendants also separately assert qualified immunity.

Finally, Defendants oppose Plaintiff's motion to supplement his complaint. Doc. 44.

The Court concludes that no reasonable juror could find that Plaintiff suffered an adverse employment action in 2014 that would give rise to due process protections and that, subsequent to 2014, no reasonable juror could conclude that Plaintiff had a property right. Therefore, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's first claim (violation of Fourteenth Amendment right to due process) and third claim (injunctive relief under the New Mexico Constitution). Plaintiff's second claim (Fourteenth Amendment deprivation of liberty) fails because Defendants did not publish the statements about which Plaintiff complains. Plaintiff's fourth claim (breach of implied written contract) fails because Plaintiff has not provided evidence of a written contract that Defendants breached. Because the Court grants Defendants' motion on these bases, it need not consider the individual defendants' qualified immunity arguments. With regard to Plaintiff's motion seeking to supplement his complaint, Plaintiff has failed to allege that Mr. Griego violated a clearly established constitutional right. As a result, Plaintiff's proposed amendments would be futile and the Court therefore denies Plaintiff's motion to supplement. Accordingly, this lawsuit is hereby dismissed with prejudice.

## I.     FACTUAL BACKGROUND[1]

The Forestry Division of the EMNRD is responsible for wildfire management in New Mexico and includes several districts, including the Las Vegas Forestry District. Doc. 1-2 ("Compl.") ¶ 6; Doc. 21-1 at 1, Doc. 1-2 at 3. During the relevant time period, Defendant Anthony Delfin was the State Forester and subsequently the Deputy Secretary of EMNRD. Compl. ¶ 4. Defendant Eddie Tudor was Deputy State Forester. Compl. ¶ 5. In these roles, Mr. Delfin and Mr. Tudor were responsible for overseeing the EMNRD's Forestry Division as well as the local Forestry Districts. Compl. ¶¶ 4-5. Proposed Defendant Donald Griego served as State

---

[1] Except as otherwise noted, the following facts are undisputed.

Fire Management Officer during the time period at issue in Plaintiff's initial complaint and, in 2017, he replaced Mr. Delfin as State Forester. Doc. 42-1 ("Proposed Suppl. Compl.") ¶ 5A.

Plaintiff worked as an Emergency Firefighter/Administratively Determined (EF/AD) for the Las Vegas District for eight straight fire seasons, beginning in 2006. Pl. Aff. ¶ 8 (Doc. 21-1). In 2013, Plaintiff became qualified as a Strike Team Leader. Pl. Aff. ¶ 4. From July 19, 2014 until August 30, 2014, in connection with his employment with the Las Vegas District, Plaintiff worked fighting fires in the State of Washington. Compl. ¶¶ 13-15.[2] No indication exists that, after this assignment, Plaintiff performed any other firefighter work in 2014, or that any additional firefighter work was needed in 2014.

Plaintiff presents evidence that various supervisors praised his work. *See* Compl. ¶ 16; Pl. Aff. ¶ 6. Nonetheless, Plaintiff asserts that, as early as September 2014, Mr. Griego informed him that a grievance might be filed against him and that, if this happened, Mr. Griego would let Plaintiff know. Pl. Aff. ¶ 9; Compl. ¶ 17.[3] Because no one informed him in 2014 that a grievance had actually been filed, Plaintiff says he assumed in 2014 that no such grievance had been filed. Compl. ¶ 19. However, on January 27, 2015, Plaintiff claims that Defendants, through Eugene Pino (Las Vegas District Fire Management Officer), told him that the Las Vegas District would no longer take his application to be an Emergency Firefighter/AD. Pl. Aff. ¶ 10; Compl. ¶ 20.

Plaintiff says he then called Mr. Griego, who told him Mr. Delfin made the decision to keep the District from re-hiring him based on a complaint filed by another AD firefighter.

---

[2] Because Plaintiff explicitly incorporated paragraphs 8-54 of his complaint in his affidavit, *see* Pl. Aff. ¶ 2, the Court considered these portions of Plaintiff's complaint for summary judgment purposes. *See Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002) (a verified complaint may be considered for purposes of summary judgment).

[3] Plaintiff initially indicated that he was told about the grievance in October 2014. Pl. Aff. ¶ 9; Compl. ¶ 17. More recently, however, Plaintiff discovered evidence that indicates he first learned of this grievance in September 2014. Pl. Supplemental Aff. ¶ 5 (Doc. 35-2).

Compl. ¶ 21; *see also* Pl. Aff. ¶ 10. Plaintiff says Mr. Griego further informed him that there had been an investigation. Compl. ¶ 22. This prompted Plaintiff to send a January 27, 2015 email to Mr. Griego and Mr. Tudor noting that he had not previously been informed about an investigation and requesting all "records and documents used in the investigation" as well as a list of all witnesses who were interviewed, and the ultimate findings and conclusions reached. *See* Doc. 21-1 Ex. B; *see also* Compl. ¶ 24.

The next day, Mr. Tudor responded via email that "[n]o formal investigation was conducted, so there are no documents available to provide you." Pl. Aff. ¶ 16(a); Compl. ¶ 25; *see also* Doc. 21-1 Ex. B. He then provided the names of three witnesses who were interviewed and noted that "the New Mexico State Forestry Division's Fire Policy and Procedures Manual (3.12.4 Hiring) states that '[t]he Division employs emergency fire fighters/ADs based on the Division's needs, not on the emergency fire fighter's/AD's need. At no time shall emergency fire fighters/ADs consider emergency incident assignments as their primary means of financial support or a permanent job with guaranteed hours or benefits.'" Doc. 21-1 Ex. B. Finally, Defendant Tudor informed Plaintiff that he could apply for the 2015 fire season. *Id.*

Two days later, Mr. Pino reiterated to Plaintiff that, although they were letting him apply for the 2015 fire season, he would not be hired because of Mr. Delfin's decision. Compl. ¶ 26; *see also* Pl. Aff. ¶ 10. Plaintiff applied on February 3, 2015, but was not hired. Compl. ¶ 28.

As a result, Plaintiff, through counsel, sent an April 3, 2015 letter to Mr. Griego complaining about Defendants' treatment of Plaintiff and asking that Plaintiff be provided an opportunity to refute the allegations that had been made against him. Def. Ex. E (Doc. 18-5). Mr. Delfin responded in a letter dated April 9, 2015. Def. Ex. A (Doc. 18-1). Mr. Delfin stated that, based on complaints stemming from Plaintiff's work in Washington State, "[t]he Division cannot

employ Mr. Vigil because he poses too great a liability to the Division." *Id*. at 5. Mr. Delfin summarized the complaints as follows:

> [Plaintiff] had conflict with the team members, demeaned permanent Forestry Division employees, displayed favoritism toward employees that he had worked with in the Las Vegas District office, told crew members how to fill out their timesheets in a specific way that did not accurately reflect the hours that they worked, or had crew members change their timesheets after they had been signed by a division supervisor, that he had the crew members violate the work/rest ratio in a manner that was unsafe, and finally had crew members drive in violation of state and federal guidelines and when they had little to no sleep.

Def. Ex. A at 3. He then stated that the Forestry Division had conducted an investigation that appears to have consisted of five interviews of unidentified persons, all of whom confirmed the allegations. *Id*. Mr. Delfin next provided further detail about the allegations and concluded "there is credible evidence to support the allegations in the complaint." *Id*. at 3-5. With regard to why the Division did not take any disciplinary action against Plaintiff, Mr. Delfin explained, "[t]hese allegations came to the Division's attention after [Plaintiff] was no longer employed and after the fire season . . . [i]f the Division had the ability to discipline him, it would have done so for misconduct." *Id*. at 5. Although the letter did not contain a threat of prosecution, Mr. Delfin stated, "[t]he alteration of the timesheets constitutes a fourth degree felony." *Id*. at 4.

Sometime after Plaintiff received this letter, he sent a letter to New Mexico Governor Susana Martinez requesting her assistance and asserting that he had documentation that would demonstrate the complaints against him were inaccurate. *See* Def. Ex. B (Doc. 18-2). On July 15, 2015, EMNRD Cabinet Secretary David Martin responded to this letter. *See* Def. Ex. A (Doc. 18-1 at 1). In addition to summarizing portions of the April 9, 2015 letter from Mr. Delfin, this letter addressed Plaintiff's lack of due process complaints as follows:

> You are not an employee in a career appointment. The nature of the Administratively Determined Fire Fighter positions is that they are emergency temporary positions used when additional fire fighters are needed. There is no

guarantee that you will be hired consistently from one season to another. The Conditions of Hire Agreement that you signed states that the Division may hire emergency firefighters whenever it becomes necessary to cope with a sudden and unexpected nature and is purely temporary in duration. (Attachment B). Since you are not a permanent career employee, you are not entitled to the due process protections to which career employees are entitled. You acknowledged this by signing the 2014 Emergency Firefighter/Administratively Determined (AD) Staffing Plan Guidance Documents on February 3, 2014.

Def. Ex. A at 1-2. The 2014 Emergency Firefighter/Administratively Determined (AD) Staffing

Plan Guidance Documents Plaintiff signed on February 3, 2014 stated in relevant part:

CONDITIONS OF HIRE

EMNRD, Forestry Division may hire emergency firefighters/ADs whenever it becomes necessary to cope with a sudden and unexpected emergency caused by a fire or extreme fire potential. Such hiring is of an uncertain nature and is purely temporary in duration.

. . .

DISCIPLINARY ACTION

Failure to adhere to this Staffing Plan, the Forestry Division Fire Policy and Procedures Manual, EMNRD Policies and Procedures, or the Governor's Code of Conduct may result in disciplinary action. Depending on the seriousness of the offense, disciplinary actions can vary from a verbal warning up to and including termination of employment. Districts shall document verbal warnings and shall provide individuals written documentation of other disciplinary actions or termination of employment.

. . .

HIRING
At the beginning of each fire season, districts shall review the applications received and select applicants based on: 1) firefighting qualifications, experience, and training; 2) documented performance, if prior applicant; 3) overall attitude and work ethic, if prior applicant; 4) acceptance of the Division's 2-hour "fill or kill" concept for incident call out; and 5) willingness to staff either hand crews, engines, or dispatch offices, depending on the need and circumstances of a district or incident.

. . .

> Emergency firefighters are employed based on the Forestry Division's needs, not on the emergency firefighter's need. At no time should emergency firefighters consider emergency incident assignments as their primary means of financial support or a permanent job with guaranteed hours. Emergency firefighters are not eligible for unemployment or unemployment benefits.

Doc. 18-1 at 6-8; Doc. 21-1 at 11.

Plaintiff applied for an Emergency Firefighter position with the Las Vegas District in 2016 and 2017, with the Socorro District in 2016, and with the Returning Heroes Wildland Firefighter Program in 2016. Compl. ¶¶ 42-46; Pl. Aff. ¶ 24. He was not, however, hired for any of these positions. *Id.*

## II. PROCEDURAL HISTORY

On March 10, 2017, Plaintiff filed suit in state court against Defendants for damages and injunctive relief. Compl. ¶ 1. Plaintiff alleges that Defendants "interfered with [his] employment, preventing him from earning a living and following his profession" and that they took these actions "without giving him the opportunity to contest specious allegations . . . and to clear his name." *Id.* On June 19, 2017, Defendants removed the lawsuit to this Court on the basis of federal question jurisdiction. *See* Doc. 1.

Plaintiff raises four claims for relief in his complaint. Doc. 1-2 at 17. Specifically, he asserts that Defendants' actions violated: (1) his right to due process under the Fourteenth Amendment; (2) his right to liberty under the Fourteenth Amendment; (3) Article II, § 18 of the New Mexico Constitution; and (4) an implied written contract established by Defendants' Fire Policy and Procedures Manual (FPPM) and other rules, policies, and law. *Id.*

On September 15, 2017, Defendants moved for summary judgment on all four of Plaintiff's claims. Doc. 18. Because Defendants asserted a qualified immunity defense in their summary judgment motion, the Court granted Defendants' motion to stay discovery. Doc. 23.

Plaintiff then requested limited discovery pursuant to Fed. R. Civ. P. 56(d), which the Court granted in part. *See* Fed. R. Civ. P. 56(d) (allowing for limited discovery relating to a summary judgment motion "when facts are unavailable to the nonmovant"); Doc. 24, Doc. 30. The parties were subsequently given an opportunity to supplement their summary judgment briefing following completion of the Rule 56(d) discovery. *See* Doc. 30; Doc. 35 (Plaintiff's Supp. Resp. Brief).

Nearly four months after briefing was completed on Defendants' summary judgment motion, Plaintiff moved to supplement his complaint pursuant to Fed. R. Civ. P. 15(d). *See* Doc. 42. Rule 15(d) provides that "[o]n motion and reasonable notice, the [C]ourt may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened *after* the date of the pleading to be supplemented." Fed.R.Civ.P 15(d) (emphasis added). In his motion, Plaintiff seeks to supplement his complaint by adding Mr. Griego as a defendant for alleged "actions which have taken place after the filing of the complaint, namely in June and July of this year [2018]." Doc. 42 at 1. While Plaintiff seeks to add Mr. Griego as a defendant, he does not raise any new claims for relief in his proposed supplemental complaint. *See* Doc. 42-1.

## III.  APPLICABLE LEGAL STANDARDS

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if there is sufficient evidence on each side

so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

### B. Motions to Supplement under Fed. R. Civ. P. 15(d)

Because supplemental pleadings "set forth new facts in order to update [an] earlier pleading", they are "distinct from amendments to pleadings under Rule 15, which relate to matters that occurred prior to the filing of the original pleading." *See Carter v. Bigelow*, 787 F.3d 1269, 1278 (10th Cir. 2015) (quoting 6A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1504 (3d ed.2014)). "Rule 15(d) gives trial courts broad discretion to permit a party to serve a supplemental pleading setting forth post-complaint transactions, occurrences or events." *Walker v. United Parcel Serv., Inc.,* 240 F.3d 1268, 1278 (10th Cir. 2001). As a general matter, "the standard used by courts in deciding to grant or deny leave to supplement is the same standard used in deciding whether to grant or deny leave to amend." *Fowler v. Hodge*, 94 F. App'x 710, 714 (10th Cir. 2004); *see also Sw. Nurseries, LLC v. Florists Mut. Ins., Inc.*, 266 F. Supp. 2d 1253, 1256 (D. Colo. 2003) (stating that "the court should apply the same standard for exercising its discretion under Rule 15(d) as it does for deciding a motion under Rule 15(a)"). Therefore, leave to supplement a complaint under Rule 15(d) "should be

liberally granted unless good reason exists for denying leave, such as prejudice to the defendants." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1186 (10th Cir. 2015) (quoting *Walker*, 240 F.3d 1268, 1278 (10th Cir. 2001)). Likewise, leave to supplement may be denied if the Court determines the proposed amendment or supplementation would be futile. *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (leave to amend under Rule 15(a) may be denied when it would be futile); *Glatt v. Chicago Park Dist.,* 87 F.3d 190, 194 (7th Cir.1996) (applying the *Foman* standard to Rule 15(d)).

## IV. ANALYSIS

### A. Plaintiff's Fourteenth Amendment Due Process Claim (Count 1) Fails

The Fourteenth Amendment prohibits any state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "In practice, this simply means that a state can't decide to take away a party's property 'unless fair procedures are used in making that decision.'" *Chiddix Excavating, Inc. v. Colorado Springs Utilities*, --- F. App'x ---, 2018 WL 2947923, at *2 (10th Cir. 2018) (unpublished) (quoting *Mitchell v. City of Moore*, 218 F.3d 1190, 1198 (10th Cir. 2000)). In order to "'prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest.'" *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007) (quoting *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). "In the context of a procedural due process claim, it is only after the plaintiff first demonstrates the existence and deprivation of a protected property interest that the plaintiff is constitutionally entitled to an appropriate level of process." *Teigen*, 511 F.3d at 1078.

"[T]he Supreme Court defines 'property' in the due-process context very broadly, as a legitimate claim of entitlement to some benefit." *Chiddix Excavating, Inc.*, 2018 WL 2947923, at

*2 (internal citation omitted). "An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'" *Teigen*, 511 F.3d 1072, 1078-79 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." *Teigen*, 511 F.3d at 1079 (internal citation omitted); *see also Hyde Park Co.*, 226 F.3d at 1210 ("Property interests are created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

In this case, Plaintiff's due process claim under the Fourteenth Amendment (Count 1) turns on whether he can establish that he possessed a protected property interest in his employment that due process protects. *See Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 827 (10th Cir. 2016) (unpublished) (stating that "[a] plaintiff must show a right to continued employment to establish a property interest in public employment that due process protects."). Because Plaintiff worked for Defendants as an Emergency Firefighter/Administratively Determined (EF/AD) in 2014, his argument that he had a property interest in his employment is stronger for that year than it is for subsequent years. Thus, the Court analyzes Plaintiff's 2014 due process claim separately from his claims that arise from alleged conduct occurring after 2014.

### i. Plaintiff Suffered No Deprivation of Property in 2014

The parties dispute whether Plaintiff's contract for employment during the 2014 fire

season created a property interest. For purposes of the present analysis, the Court assumes that Plaintiff had a property interest in his continued 2014 employment. Given this assumption, the Court must next ask whether Defendants deprived Plaintiff of this property interest. Without such a deprivation, there can be no due process violation. *See Teigen*, 511 F.3d at 1078 (plaintiff must demonstrate deprivation of a protected property interest to maintain a Fourteenth Amendment procedural due process claim).

The parties do not dispute that Plaintiff was assigned to fight fires in Washington through August 2014. Plaintiff does not assert, much less present evidence, that a need for emergency firefighter work existed at any point during the remainder of 2014. Thus, Plaintiff has neither asserted nor provided evidence that Defendants deprived him of employment during 2014. Nor does Plaintiff allege or present evidence that he received any sort of reprimand or other discipline in 2014. Indeed, he acknowledges that, because he was not notified of any formal complaint having been filed against him in 2014, he assumed nothing came of the complaints Mr. Griego said might be filed against him. *See* Compl. ¶¶ 17, 19. Thus, even assuming Plaintiff had a property interest in 2014, Plaintiff has not presented evidence that Defendants deprived him of that interest in 2014.

Plaintiff argues, however, that even if Defendants did not take any disciplinary action against him in 2014, the conduct in question occurred in 2014 and Defendants cannot deprive Plaintiff of the right to contest findings regarding that alleged conduct by waiting until 2015 to take any action against Plaintiff. *See* Doc. 21 at 7. In support of this argument, Plaintiff cites *West v. Grand County*, 967 F.2d 362, 367-68 (10th Cir. 1992). *West*, however, concerns an entirely different situation. The Tenth Circuit in *West* held that a sham reduction in force directed at one employee does not allow the employer to circumvent the pre-termination hearing to which

the employee would be entitled in a non-reduction of force termination. *See West*, 967 F.2d at 367-68. The present case, however, does not involve a sham reduction of force. Again, no evidence exists that *any* emergency firefighters were needed during the remainder of 2014 or that *any* emergency firefighters worked for the Las Vegas District after August 2014.

In addition to *West* being distinguishable, undisputed facts show that Defendants did not in 2015 discipline or reprimand him for conduct that occurred in 2014. Defendants did refuse to hire Plaintiff after 2014 based on their determination that the 2014 allegations against Plaintiff were credible. Refusing to hire a former employee, however, is different than disciplining a current employee. The fact that Defendants never disciplined Plaintiff for his alleged 2014 conduct is fatal to Plaintiff's argument that Defendants deprived him of his due process rights in 2014. The question left unanswered – whether Defendants' subsequent refusal to hire Plaintiff constituted a due process violation – is the one the Court turns to next.

### ii. After 2014, Plaintiff Had No Property Interest Giving Rise to Due Process Protections

Defendants do not dispute that Plaintiff worked as an EF/AD with the Las Vegas District for eight straight seasons leading up to 2015. Nor do Defendants dispute that, based on the 2014 allegations that Plaintiff disputes, Defendants have since refused to hire him. Although Defendants assert that their consideration of Plaintiff's letters constituted a "sufficient name clearing hearing" (Doc. 18 at 12), their primary argument is that Plaintiff's 2014 temporary employment ended without discipline and Plaintiff thereafter had no constitutionally protected right to be re-hired. In response, Plaintiff proffers several arguments as to why he retained a property interest in EF/AD employment after 2014.

Plaintiff argues that his 2014 employment did not end "before persons could apply for the 2015 EF/AD positions in early 2015." Doc. 35 at 1. In support of this argument, Plaintiff notes

that he was hired for the 2014 "fire season" and then provides evidence regarding the indeterminate period of a fire season. The Court agrees that Plaintiff's 2014 employment did not contain a definite end date. However, drawing all reasonable factual inferences in favor of Plaintiff, the Court concludes that Plaintiff's temporary employment for the 2014 fire season ended no later than December 31, 2014.

The process Defendants engaged in to fill EF/AD positions in 2015 further supports the conclusion that 2014 EF/AD firefighters did not have their employment carried over into 2015. Rather than simply carrying employees over from 2014, Defendants returned to square one. *See* Def. Ex. D (Doc. 18-4 at 1-2). They solicited applications, received applications, made their hiring decisions, and signed new contracts. *Id*. This process indicates a break in employment rather than continuous EF/AD employment. Because the evidence Plaintiff presents about the length of the 2014 fire season cannot support a conclusion that Plaintiff's employment continued into 2015, Plaintiff's argument that there was no break in employment from year to year fails.

Even if a break in EF/AD employment occurs from year to year, however, Plaintiff next argues that he enjoyed tenure similar to what teachers enjoy from one school year to the next. Doc. 21 at 7-8. Plaintiff relies on *Perry v. Sindermann*, 408 U.S. 593 (1972) to support his argument. *Perry* involved a teacher who a state college employed for four successive years, under a series of one-year contracts. *Id*. at 594. When the college declined to offer the teacher a fifth one-year contract, with no explanation or opportunity to be heard, the teacher brought a lawsuit alleging, among other things, that the college violated his Fourteenth Amendment procedural due process rights. *Id.* at 595. The teacher asserted that the college had a de facto tenure policy and, in support, cited to language in the college's official Faculty Guide that stated, "the College wishes the faculty member to feel that he has permanent tenure as long as his

teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work." *Id*. at 599-600. Language such as this, the Court held, was enough to get the teacher past summary judgment. *Id*. at 602 ("respondent . . . might be able to show from the circumstances of this service – and from other relevant facts – that he has a legitimate claim of entitlement to job tenure.").

In so holding, however, the Supreme Court reiterated its holding in *Board of Regents v. Roth*, that "the Constitution does not require opportunity for a hearing before the nonrenewal of a nontenured teacher's contract, unless he can show that the decision not to rehire him somehow deprived him of an interest in 'liberty' or that he had a 'property' interest in continued employment, despite the lack of tenure or a formal contract." *Id*. at 599 (citing *Board of Regents v. Roth*, 408 U.S. 564 (1972)). The terms of employment in *Roth*, unlike those in *Perry*, provided a specific termination date and "made no provision for renewal whatsoever." *Roth*, 408 U.S. at 578. Similarly, in *Roth*, "no state statute or University rule or policy . . . secured interest in re-employment or [] created any legitimate claim to it." *Id*. As a result, while the teacher in *Roth* might have had an "abstract concern in being rehired [] he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." *Id*. Reading *Roth* and *Perry* together, it becomes clear that the salient question in the present case is whether Plaintiff has some "independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

Plaintiff has failed to cite an independent source upon which he can hinge a property interest to be re-hired in 2015. Plaintiff's attempt to hinge his asserted property interest on provisions that applied in 2014 fails because Plaintiff was not disciplined or fired in 2014. Next,

Plaintiff points out that he had been hired as an EF/AD for the past eight years. Doc. 21 at 8. For each of these years, however, Plaintiff had to re-apply and the evidence indicates that Defendants consistently made clear to Plaintiff that his employment each year was only temporary employment. Plaintiff has cited no case that indicates these facts would establish a property interest.

Plaintiff's representation that Mr. Pino, who was the Las Vegas District's Fire Management Officer, would have liked to rehire him does not change this result. Doc. 21 at 8. Plaintiff does not allege that Mr. Pino actually offered him the job after 2014 and, regardless of what Mr. Pino would have liked to do, his wishes were subordinate to those above him who chose not to rehire Plaintiff. Thus, Plaintiff is more similar to the teacher in *Roth*, who could demonstrate no property interest in rehire, than to the teacher in *Perry,* who established a property interest through language contained in his employer's official Faculty Guide.

As an alternative argument, however, Plaintiff asserts that the EMNRD provided the Las Vegas District with discretion to choose its own EF/ADs and, therefore, the EMNRD had no authority to interfere with Mr. Pino's hiring preferences. Doc. 21 at 8. In support of this position, Plaintiff cites section 3.12.4 of the Fire Policy and Procedures Manual which states:

> **The district shall select** the required number of engine bosses, engine crewmembers, and support staff and assign an engine boss and crewmembers to each engine. If the district is hiring engine crewmembers to be engine operators it shall designate specific crewmembers as engine operators. **The district shall determine fire danger conditions and staff accordingly.**

*Id*. (citing doc. 18-4 at 2-3 (emphasis added by Plaintiff)). This argument is different than other arguments in the same section of Plaintiff's brief. Plaintiff's argument here is not that Defendants deprived him of property (employment) he already had but, rather, that Defendants interfered with his ability to obtain employment that he wanted. This argument is more similar to

the one Plaintiff makes in his motion to supplement his complaint: that *Truax v. Raich*, 239 U.S. 33 (1915) and its progeny recognize that the government cannot interfere with a person's ability to obtain employment from a third party. The problem with this argument as it applies to work for the Las Vegas District is that the Las Vegas District is not a third party. Instead, the Las Vegas District is a division of, and reports to, the EMNRD. Thus, Plaintiff is essentially arguing that the EMNRD interfered with its own hiring decision.

Further, Plaintiff's own evidence indicates that while upper level management at the EMNRD may have generally delegated hiring decisions to the individual Districts, it retained ultimate authority over hiring decisions. For instance, Plaintiff acknowledged in the first paragraph of his affidavit that the Las Vegas District is a subordinate division of the EMNRD. Pl. Aff. ¶ 1 ("I was formerly employed as an Emergency Firefighter/Administratively Determined (EF/AD) with **Las Vegas Forestry District of the EMNRD**.") (emphasis added). In his complaint, Plaintiff averred that the Deputy Secretary of the EMNRD was "responsible generally for overseeing the Department's Forestry Division. He was responsible for all aspects of the Forestry Division's internal operations, including supervision of staff, as well as programs (including Wildfire Management)." Doc. 1-2 at 2. Mr. Pino, who was in charge of the Las Vegas District, further acknowledged that his ability to hire whoever he wanted was limited by the desires of those above him at the EMNRD. *See* Pl. Aff. ¶ 10 ("In January 2015, prior to the 2015 fire season, Mr. Pino advised me that he could not hire me or call me in for that season because the Santa Fe office (Defendants Tudor and Delfin) would not allow him due to the time fraud allegation that had been made against me. Then in February, he told me Defendants were going to allow me to turn in the EF/AD application (which I did on or around March 3rd), but they still would not allow him to hire me because of the allegations."). And, when Plaintiff retained an

attorney to pursue getting him hired in 2015, his attorney wrote to the EMNRD's Protection Bureau Chief, not the head of the Las Vegas District. *See* Def. Ex. E (Doc. 18-5). Considering all of this, even when drawing all reasonable factual inferences in favor of Plaintiff, no reasonable jury could conclude that the EMNRD, through section 3.12.4 of the Fire Policy and Procedures Manual, conferred on the Las Vegas Forestry District a non-revocable delegation of authority to hire whoever it wanted, owing no deference to contrary decisions of those in upper management.

This conclusion reduces Plaintiff's argument to the following: upper level management at the EMNRD violated the United States' Constitution when it prevented lower level management from hiring Plaintiff. For this argument to succeed, Plaintiff would have to present evidence that he had a right to be hired. Plaintiff has not done this. As a result, regardless of whether upper level management's directive not to hire Plaintiff was fair or unfair, it did not violate the United States' Constitution.

In sum, the Court concludes that no reasonable juror could find that Plaintiff suffered an adverse employment action in 2014 that would give rise to due process protections and that, subsequent to 2014, no reasonable juror could conclude that Plaintiff had a property right. Therefore, the Court grants Defendants' motion for summary judgment with regard to Plaintiff's due process claim under the Fourteenth Amendment (Count 1).

### B. Plaintiff's Fourteenth Amendment Deprivation of Liberty Claim (Count 2) Fails Because No Evidence Exists That Defendants Published the Alleged Defamatory Statements Outside State Agencies

The Court next considers Plaintiff's claim that Defendants deprived him of his liberty interest without due process of law in violation of the Fourteenth Amendment (Count 2). Plaintiff specifically alleges that Mr. Delfin and EMNRD Cabinet Secretary David Martin made statements in letters they wrote accusing him of "dishonesty, [and] more precisely of felony

criminal fraud" and "of jeopardizing the lives of his crew members". *See* Doc. 21 at 10. Plaintiff

contends that Defendants sent these letters to other forestry districts within the EMNRD and

New Mexico state programs with a "directive not to hire" Plaintiff and that in so doing,

Defendants foreclosed Plaintiff from obtaining other employment opportunities. Doc. 21 at 14-

15 (alleging lost work opportunities with Las Vegas district (2016-2017), Socorro district (2016),

and Returning Heroes Program (2016)).

     The parties agree that *Workman v. Jordan*, 32 F.3d 475 (10th Cir. 1994) controls the

Court's analysis of Plaintiff's deprivation of liberty claim. In *Workman*, the Tenth Circuit

recognized that a person has a "liberty interest in his good name and reputation as it affects his

protected property interest in continued employment." 32 F.3d at 480 (citing *Paul v. Davis*, 424

U.S. 693 (1976)); *see also McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014) ("[a] public

employee has a liberty interest in his good name and reputation as they relate to his continued

employment"). Under *Workman*, "[t]he government infringes upon that interest when: (1) it

makes a statement that impugns the good name, reputation, honor, or integrity of the employee;

(2) the statement is false; (3) the statement is made during the course of termination *and*

forecloses other employment opportunities; and (4) the statement is published, in other words

disclosed publically." *McDonald*, 769 F.3d at 1212 (citing *Workman*, 32 F.3d at 481) (brackets,

footnote, and internal quotation marks omitted). "These elements are not disjunctive, all must be

satisfied to demonstrate deprivation of the liberty interest." *Workman*, 32 F.3d at 481.

     Although Defendants argue in their summary judgment motion that Plaintiff fails to meet

at least three of the *Workman* elements, the Court focuses on Defendants' contention that Mr.

Delfin and Cabinet Secretary Martin's letters were never published. *See* Doc. 18 at 10. In his

response brief, Plaintiff acknowledged that the Tenth Circuit has held that "intra-governmental

dissemination, by itself, falls short of the Supreme Court's notice of publication: 'to be made public'." *See* Doc. 21 at 15 (quoting *Asbill v. Housing Auth. of Choctaw Nation*, 726 F.2d 1499, 1503 (10th Cir. 1984). At oral argument, Plaintiff conceded that *Asbill* is controlling and that his evidence is limited to intra-governmental dissemination of the letters. *See* Tr. at 57. Consequently, because no evidence exists that Defendants published the alleged defamatory statements outside of state governmental entities, the Court concludes that Plaintiff is unable to demonstrate deprivation of a liberty interest under *Workman*. Defendants are therefore entitled to summary judgment on Plaintiff's Fourteenth Amendment deprivation of liberty claim (Count 2).

### C. Plaintiff's State Constitutional Claim (Count 3) Fails

Plaintiff's third claim is a due process claim under Article II, § 18 of the New Mexico Constitution. In New Mexico, when courts analyze "a state constitutional provision with a federal analogue," courts apply an "interstitial approach." *Morris v. Brandenburg*, 2016-NMSC-027, ¶ 19, 376 P.3d 836. Under this approach, courts "first examine whether an asserted [state constitutional] right is protected under an equivalent provision of the United States Constitution." *Id*. "If the right is protected, then, under the New Mexico Constitution, the claim is not reached." *Id*. "The burden is on the party seeking relief under the state constitution to provide reasons for interpreting the state provisions differently from the federal provisions when there is no established precedent." *Id*. (internal citation omitted).

"In language substantively indistinguishable from that of the Fourteenth Amendment to the United States Constitution, Article II, Section 18 of the New Mexico Constitution states, 'No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws.'" *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 87, 410 P.3d 201. The Fourteenth Amendment is the federal analogue to the due process

provision of Article II, § 18 of the New Mexico constitution. *See Morris*, 2016-NMSC-027, ¶ 18 (noting that the "state constitution's due process guarantees are analogous to the due process guarantees provided under the United States Constitution.").

In this case, Plaintiff does not present any authority that his due process rights under the state constitution would differ from the standard set forth in the analysis of these rights under the Fourteenth Amendment, nor does he contend that the state constitution provides broader due process protections than its federal counterpart. *See e.g.*, *E. Spire Communications, Inc. v. Baca*, 269 F.Supp.2d 1310, 1324 (D.N.M. 2003) (using the federal standard to analyze the plaintiff's claims for violation of substantive due-process rights under the New Mexico Constitution because the plaintiff did not present any authority that the standard under the New Mexico Constitution would differ from the standard under the United States Constitution).

Therefore, the Court's analysis of Plaintiff's Fourteenth Amendment claims applies equally to Plaintiff's state constitutional claim.[4] Plaintiff's claim under Article II, Section 18 of the New Mexico constitution (Count 3) is therefore also subject to summary judgment.

### D. Plaintiff's Breach of Contract Claim (Count 4) Fails

Defendants lastly seek summary judgment on Plaintiff's claim that Defendants breached an implied written contract "established by Defendants' Fire Policy and Procedures Manual (FPPM) and other rules, policies, and law." Compl. ¶¶ 60, 66; Doc. 18 at 14-15. Defendants contend that they are entitled to summary judgment because there is no evidence supporting the

---

[4] Plaintiff specifically seeks injunctive relief with regard to his state constitutional claim, i.e., that the Court "enjoin Defendants from not allowing the Las Vegas District from hiring him as an EF/AD in the future." *See* Doc. 21 at 18. As Plaintiff acknowledged at the hearing, the success of this claim hinges on whether there is a constitutionally protected property interest. As set forth in the analysis of Plaintiff's Fourteenth Amendment claim, the Court has concluded that no reasonable juror could conclude that Plaintiff had a property right after 2014. Thus, for the same reasons that applied to his federal constitutional due process claims, Plaintiff's state due process constitutional claim fails as well.

existence of a valid written contract or an enforceable implied contract between Plaintiff and Defendants subsequent to 2014. *See* Doc. 18 at 15. The Court agrees.

Plaintiff has presented evidence of a written employment contract for 2014. However, as discussed earlier, Plaintiff was assigned to fight fires in Washington through August 2014 and he did not present evidence that a need for firefighter work existed at any point during the remainder of 2014. Thus, Plaintiff has neither asserted nor presented evidence that there was a breach of the written contract for 2014. The Court concludes that no reasonable juror could find that there was a breach of the 2014 contract.

Subsequent to 2014, however, Plaintiff asserts the existence of an implied written contract for employment based on his 2014 employment contract and the FPPM Plaintiff received in connection with his 2014 employment. *See* Compl. ¶¶ 60, 66. "Under New Mexico law, whether an implied contract was created is generally a question of fact." *Sullivan v. Am. Online, Inc.*, 219 F. App'x 720, 721 (10th Cir. 2007) (unpublished). "Thus, only if the evidence is insufficient to create a genuine issue of material fact regarding whether an implied contract was established is summary judgment appropriate. *Id*. at 721-22 (internal citation and quotation marks omitted). "An implied contract is created only where an employer creates a reasonable expectation of continued employment." *Id*. "An employer creates an implied contact where the employer's action 'was intended, or reasonably could be interpreted by [the employee] to be confirmation of an implied contract or a modification of the employment relationship.'" *Id*. (citing *Hartbarger v. Frank Paxton Co*., 1993-NMSC-029, 857 P.2d 776). "A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct." *Hartbarger*, 1993-NMSC-029, ¶ 6.

In this case, Plaintiff's 2014 employment contract could not have given rise to an implied contract for employment in subsequent fire seasons. Plaintiff signed a conditions of hire agreement attesting to his understanding that his emergency firefighter/AD position was "of an uncertain nature and [] purely temporary in duration". (Doc. 18-1 at 6). In addition, the FPPM reiterated that Plaintiff's 2014 employment was of "a purely temporary duration based on Division needs and preparedness levels." Def. Ex. D (Doc. 18-4). The FPPM also provided that emergency firefighters/ADs were not to consider "emergency incident assignments as their primary means of financial support or a permanent job with guaranteed hours or benefits." *Id*. at 3. In light of these unequivocal written declarations of the temporary nature and limited duration of Plaintiff's 2014 emergency firefighter/AD appointment, the Court concludes that Plaintiff could not have reasonably expected that his 2014 contract would give rise to continued employment in subsequent fire seasons.

Nor could provisions of the FPPM gave rise to an implied employment contract. In his response brief and at oral argument, Plaintiff failed to point to any particular provision of the FPPM that he could reasonably have viewed as confirmation of continued employment as an emergency firefighter/AD in subsequent fire seasons. As indicated above, the FPPM repeatedly stated that EF/AD appointments were temporary in nature and limited in duration. Although Plaintiff elsewhere cites to FPPM provisions concerning the hiring process, he does not point to any aspect of those hiring provisions that could give rise to an implied employment contract.

Thus, Plaintiff's fourth claim fails because Plaintiff has not provided evidence of a written contract. Defendants are therefore entitled to summary judgment as to this claim.

### E. Plaintiff's Motion to Supplement is Denied because the Supplementation Plaintiff Seeks to His Complaint Would Be Futile

Plaintiff's complaints about Defendants' actions do not stop with their failure to hire him

– he also argues that, to this day, there is interference with his property right to engage in private employment. Specifically, he alleges that at two different times in 2018, Donald Griego, who replaced Defendant Delfin as New Mexico's State Forester, interfered with contracts Plaintiff had with non-state entities. Plaintiff argues that this interference in the absence of due process is unconstitutional because the United States Supreme Court has long recognized the "right to earn a livelihood and to continue in employment unmolested." Doc. 45 at 8 (quoting *Truax v. Raich*, 239 U.S. 33, 38 (1915)). As a result, Plaintiff seeks to supplement his complaint to include these recent allegations against Mr. Griego. Doc. 42. Defendants argue that Plaintiff's proposed supplementation would be futile because Mr. Griego is entitled to qualified immunity. Ultimately, the Court agrees with Defendants that, even taking Plaintiff's allegations as true, the law is not clearly established that Mr. Griego violated Plaintiff's Fourteenth Amendment right to due process.

### i. Factual Allegations

Plaintiff states that on June 1, 2018, he entered into a contract with the Rainsville Volunteer Fire Department in Mora County, New Mexico to provide firefighting services and that he then was released prematurely from this service. Doc. 42-1 at ¶¶ 47A, 47C. Similarly, he asserts that on July 7, 2018, the United States Forest Service hired his company to provide equipment and services to combat a fire and that he also was prematurely released from this service. *Id*. at ¶¶ 47E, 47G. Plaintiff asserts that Mr. Griego cut short both of these employment opportunities. *Id*. at ¶ 47H. He does not, however, say exactly what he believes Mr. Griego did.

Rather, Plaintiff asserts that after being released from his July employment he received a call from an employee of EMNRD's Las Vegas District who told Plaintiff he overheard Returning Heroes Program Supervisor Stephanie Griego speaking to another EMNRD employee

and that this discussion involved getting Plaintiff released from the July employment. *Id.* at ¶ 47F. Plaintiff then states, "[u]pon information and belief Donald Griego, State Forester, told [Stephanie] Griego and other of EMNRD's employees to have Plaintiff released from the [July] fire, and was also responsible for his release from the [June] fire. Mr. Griego was the only person who could have authorized these releases." *Id.* at ¶ 47H. Significantly, Plaintiff makes no specific allegations that tie Stephanie Griego's alleged statements to Donald Griego other than to assert that Donald Griego had taken actions against Plaintiff in 2014 and was likely the only EMNRD employee with authority "to make decisions regarding the interference with the contracts entered into between Mr. Vigil and third parties not part of the State of New Mexico executive branch." *Id.* at ¶ 47I.

### ii. Analysis

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The defense of qualified immunity "is available only in suits against officials sued in their personal capacities, not in suits against . . . officials sued in their official capacities."[5] *Cox v. Glanz*, 800 F.3d 1231, 1239 n.1 (10th Cir. 2015). "[W]hen a defendant has raised qualified immunity as a defense, the plaintiff must establish (1) that the defendant's action violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions." *Grissom v. Roberts*, 902

---

[5] Plaintiff failed to explicitly indicate in either his motion or his proposed supplemental complaint whether he seeks to sue Mr. Griego in his individual capacity, his official capacity, or both. However, in his reply brief, Plaintiff acknowledged this inadvertent error and stated that he meant to allege claims against Mr. Griego "individually and in his official capacity" in his supplemental complaint. *See* Doc. 45 at 3.

F.3d 1162, 11 (10th Cir. 2018). "If the plaintiff fails to satisfy either part of the two-part inquiry, a court must grant the defendant qualified immunity. The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Id*. (internal citations omitted).

The Court begins at the second prong of the qualified immunity analysis – whether Mr. Griego's alleged conduct violates a clearly established right. Plaintiff asserts that the United States Supreme Court has long recognized the "right to earn a livelihood and to continue in employment unmolested" and that Defendant Griego's interference with his ability to maintain employment with non-state entities has denied him property without due process. Doc. 45 at 8 (quoting *Truax v. Raich*, 239 U.S. 33, 38 (1915)). *Truax*, however, does not clearly establish such a general right. The passage Plaintiff quotes reads in full, "[t]he right to earn a livelihood and to continue in employment unmolested *by efforts to enforce void enactments* should similarly be entitled to protection in the absence of adequate remedy at law." *Truax*, 239 U.S. at 33 (emphasis added). In a recent unpublished opinion, the Tenth Circuit read *Truax* narrowly, noting that it has never extended the right against arbitrary interference with private employment "beyond the circumstances encountered by the Supreme Court" and that, it has never explicitly "recognized that arbitrary government interference with private employment can be a plausible claim based on a recognized constitutional theory." *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 833 (10th Cir. 2016) (unpublished).

While *Coleman* is unpublished and therefore non-binding, it is persuasive. First, it thoroughly analyzes relevant case precedent setting forth when government interference with private employment constitutes a *well-established* constitutional violation. Second, *Coleman* arises from a procedural posture similar to the present case: the plaintiff in *Coleman* sought to

amend her complaint to add a claim of governmental interference with private employment and appealed the district court's denial of her motion. *Id.* at 826.

In *Coleman*, the founder of a charter school sought to supplement her complaint to allege that the State Charter Board violated her due process rights when it interfered with her ability to continue to serve on the board of directors. *Id.* at 826. Citing *Truax*, the Tenth Circuit recognized that "the Supreme Court has established a right against arbitrary governmental interference with private employment and that it is a recognized constitutional theory through which claims can plausibly be brought." *Coleman*, 673 F. Appx. at 833. However, it continued, "[t]he right is heavily fact-dependent . . .." *Id.* Noting the Supreme Court's admonition "not to define clearly established law at a high level of generality", the Tenth Circuit concluded that none of the settings present in previous Supreme Court cases concerned education in public and charter schools and that "[t]o extend those cases to the charter school setting would go too far, especially given the Supreme Court's admonition to avoid precisely that kind of expansive holding." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

In denying the plaintiff's motion to amend, the *Coleman* court considered many of the same legal arguments Plaintiff now makes in the present case. For instance, the Tenth Circuit took note of *Fernandez v. Taos Mun. Schs. Bd. Of Educ.*, 403 F.Supp. 2d 1040, 1043 (D.N.M. 2005), several other district court cases from the Tenth Circuit, and several other circuit court cases that interpreted *Truax* more broadly. The Tenth Circuit concluded, however, that these non-binding sources did not establish a clearly defined constitutional right under the facts presented.

Similarly, Plaintiff's failure to plead facts similar to Supreme Court precedent is fatal to his motion to supplement. *See Coleman*, 673 F. App'x at 833 ("The right is heavily fact-

dependent, though, and to overcome any claim of qualified immunity, a plaintiff would have to plead facts far more similar to Supreme Court precedent than those that Coleman has presented.").  Plaintiff generally alleges, based on "information and belief", that Mr. Griego had Plaintiff released from working on two fires in 2018. Doc. 41-1 at ¶ 47H.  But, how did Mr. Griego accomplish this? This question matters because, for it to be actionable, government interference with private employment must be arbitrary. *Coleman*, 673 F. App'x at 831. Further, as the case on which Plaintiff primarily relies notes, "[p]rivate conduct generally does not occur under color of state law, but there are exceptions and a State may be responsible where it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Fernandez v. Taos Mun. Sch. Bd. of Educ.*, 403 F.Supp.2d 1040, 1041 (D.N.M. 2005).[6] Plaintiff's proposed complaint does not allege facts sufficient to demonstrate arbitrariness or coercion.

Take the June fire first. Plaintiff asserts that the Rainsville Volunteer Fire Department released him without stating a reason. Doc. 41-1 at ¶ 47C. He does not allege who from the state government allegedly talked to the Rainsville Volunteer Fire Department or what anyone from the state government said or did to have him released. Instead, he asserts that, a month after he was released, a former colleague overheard Stephanie Griego discussing getting Plaintiff released from the July fire and, the next day, Plaintiff was released *from the July fire*. Doc. 41-1 at ¶ 47F. From this, Plaintiff infers that Donald Griego "told [Stephanie] Griego and other of

---

[6] The Court is aware that Plaintiff did not work for a private employer. During the first fire he worked for the Rainsville Volunteer Fire Department, and during the second fire, he worked for the United States Forest Service. Doc. 41-2 at ¶¶ 47A, 47E. However, Plaintiff is not asserting that the non-State governments for whom he worked did anything wrong. Instead, he is alleging that the State government interfered with his employment with non-State government entities. Whether the State government allegedly interfered with Plaintiff's employment with a private entity or a non-State public entity is immaterial. As the third party employer, the non-State governments for which Plaintiff worked are like private employers.

EMNRD employees to have Plaintiff released from the Morris Creek fire [the July fire], and was also responsible for his removal from the Ute park fire [the June fire]." Doc. 41-1 at ¶ 47H.

While a plaintiff is allowed to allege facts based on "information and belief", "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. et al. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Al-Owhali v. Holder*, 687 F.3d 1236, 1242-43 (10th Cir. 2012) ("At bottom, Al-Owhali claims without substantiation that he believes there is a secret policy in place that prevents him from obtaining the book. Such a claim, without more, is simply too speculative."). Plaintiff's conclusion that because a friend overheard Stephanie Griego talking about Plaintiff being released from the July fire, that Donald Griego must have been behind Plaintiff being released from a separate fire one month earlier is the type of speculative conclusion the Court in *Twombly* found cannot support a claim. Moreover, even if Mr. Griego did say or do something that caused Rainsville to release Plaintiff, Plaintiff has not alleged that what Mr. Griego said or did was arbitrary or coercive. As a result, it would be futile to allow Plaintiff to file his proposed supplemental complaint to assert a claim for unconstitutional interference with regard to the June fire.

With regard to the July fire, Plaintiff at least establishes a temporal connection between Stephanie Griego's alleged comments and his removal from this fire the next day. Plaintiff completely fails, however, to allege how Mr. Griego, a state employee, could coerce or otherwise cause the United States Forest Service to take any action it was not otherwise inclined to take. Plaintiff has not cited, and the Court is not aware of, any successful governmental interference case in which the government defendant had no apparent means to regulate, control, or exert influence over the third-party employer. For Plaintiff's claim to succeed, he would have to allege how a State EMNRD employee exerted so much influence over the United States that the actions

of the United States were attributable to the State EMNRD. Because Plaintiff has not done this, allowing his proposed claim related to the second fire to proceed would also be futile.

Moreover, regardless of whether the June or July fire is at issue, Mr. Griego can only be found liable to Plaintiff if he was placed on fair notice at the time of his alleged conduct that such conduct would violate Plaintiff's constitutional rights. *Coleman* teaches that this determination is fact specific. Plaintiff, however, does not describe the specific conduct he alleges Mr. Griego took. Plaintiff's general allegation that Mr. Griego was responsible for his removal falls short of the type of specific allegation Plaintiff must make to state a claim. Given the numerous legitimate means through which a state employee could be responsible for a person losing a job with a third-party employer (such as a simple poor reference), the Court cannot say it is clearly established that Mr. Griego's unspecified alleged conduct violated a constitutional right.

Thus, Plaintiff's proposed supplementation to add Mr. Griego in his individual capacity is futile because, even accepting the facts Plaintiff seeks to allege as true, Mr. Griego would be entitled to qualified immunity. To the extent Plaintiff seeks to sue Mr. Griego in his official capacity, such a claim is in reality a claim against the EMNRD. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (explaining that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office"). "A municipality may be held liable under § 1983 when a plaintiff shows 'the existence of a municipal policy or custom' and 'a direct causal link between the policy or custom and the injury alleged." *Allen v. Lang*, 2018 WL 3045352, at *5 (10th Cir. June 20, 2018) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). In his proposed supplemental complaint, Plaintiff fails to allege that Mr.

Griego acted in accordance with any EMNRD custom or policy. Because Plaintiff has not alleged an official policy or practice to establish liability under *Monell*, the Court concludes that such a claim would also be futile. Therefore, the Court will deny Plaintiff's request to supplement his complaint.

## V. CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiff's Motion to Supplement (Doc. 42) and **GRANTS** Defendants' Motion for Summary Judgment (Doc. 18). All claims raised in Plaintiff's complaint are hereby dismissed with prejudice.

**IT IS SO ORDERED.**

**UNITED STATES MAGISTRATE JUDGE**
Presiding by Consent